**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

ADELE VAN HASTE,

                    Plaintiff,

v.

CORAM HEALTHCARE CORP.,

                    Defendant.

Civ. No.  06-4637 (DRD)

**O P I N I O N**

*Appearances by:*

Thomas N. Ryan, Esq.
Ursula H. Leo, Esq.
LADDEY, CLARK, & RYAN, LLP
60 Blue Heron Road
Suite 300
Sparta, New Jersey  07871

    *Attorneys for Plaintiff*

Peter O. Hughes, Esq.
Thomas J. Rattay, Esq.
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
10 Madison Avenue
Suite 402
Morristown, New Jersey  07960

    *Attorneys for Defendant*

**DEBEVOISE, Senior District Judge**

Plaintiff, Adele Van Haste, alleges that she was terminated in violation of New Jersey's Conscientious Employee Protection Act ("CEPA"), N.J. Stat. Ann. 34:19-1, in retaliation for having threatened to disclose the billing errors of Defendant Coram Healthcare Corporation ("Coram") to Medicaid.  Coram counters that Ms. Van Haste's termination was warranted following her poor performance as Director of Coram's Patient Financial Service Center ("PFSC") in Totowa, New Jersey.

Coram now moves for summary judgment on the grounds that (1) Ms. Van Haste cannot show a causal link between her threats to disclose the Medicaid billing errors and her subsequent firing and (2) Ms. Van Haste cannot demonstrate that Coram's reasons for terminating her employment were pretexual.  Coram also moves to dismiss Plaintiff's claim for punitive damages.  Because there are no genuine issues of material fact and Ms. Van Haste has failed to assert evidence demonstrating that Coram's reasons for firing her were pretexual, Coram's motion for summary judgment on Plaintiff's CEPA claim will be granted.  Because the Court grants Coram's motion for summary judgment, Coram's motion to dismiss Ms. Van Haste's claim for punitive damages is dismissed as moot.

## I.  BACKGROUND

Coram is a healthcare facility that provides alternate site infusion therapy and related services.  Coram's PFSCs are responsible for billing and collecting for the therapies provided by Coram to its patients.  Van Haste began working for Coram in January of 2003 as the Director of Coram's PFSC in Malvern, Pennsylvania ("Malvern PFSC").  She was an at-will employee.  Ms. Van Haste's responsibilities included managing the operations and personnel of the PFSC to

2

ensure that Coram's reimbursement billing was carried out properly and managing the accounts

receivable process to ensure that cash was being collected in a timely manner.

**A.      Merger of the Malvern PFSC and Totowa PFSC**

In January 2004, Coram consolidated the Malvern PFSC, where Van Haste worked, into

the PFSC in Totowa, New Jersey ("Totowa PFSC").  Ms. Van Haste was responsible for

planning the consolidation and transition of services from the Malvern PFSC to the Totowa

PFSC.  Upon her transfer to the Totowa PFSC, Ms. Van Haste held the position of Co-Director,

PFSC.  Robert Trivett was also Co-Director of the Totowa PFSC.  As Co-Directors, Ms. Van

Haste managed the government payors and Mr. Trivett managed the commercial payors.  In May

2004, Mr. Trivett left Coram and Ms. Van Haste became the sole Director of the Totowa PFSC.

As the Director, Ms. Van Haste ran the operations of the PFSC and was responsible for its

performance.  Additionally, Ms. Van Haste and her immediate supervisor, regional vice president

Angela Velella, were responsible for hiring additional staff and reorganizing the staff.

As a result of the consolidation, the Totowa PFSC became Coram's largest PFSC in

terms of the number of people working at the Center, the total amount of outstanding accounts

receivable for any of Coram's PFSCs, and the amount of business handled by the Center.

Following the consolidation and throughout the remainder of 2004, the Totowa PFSC

encountered significant challenges.  The Totowa PFSC was not meeting Coram's performance

standards with respect to unbilled accounts, cash collections, held accounts, aged accounts

receivable and the number of accounts billed per month, though the parties dispute whether some

of these issues existed at the time Van Haste began as Co-Director of the Totowa PFSC.  In July

2004, Ms. Van Haste developed "Action Plans" to address and resolve the growing problems

3

with accounts receivable with seventeen commercial payors.

In the first quarter of 2005, Merl Wallace, Coram's National Director for Reimbursement, created a document entitled "Significant Issue[s] in 2004," highlighting problems with staffing, management, and "payor issues" at the Totowa PFSC.  In January 2005, Coram's Board of Directors met to discuss the backlog associated with unvouchered claims, reimbursement reconciliation, and collection of cash which resulted from the numerous changes and consolidations that had taken place within the Totowa PFSC.  In February 2005, at the direction of the Board, Coram formed the "Totowa Accounts Receivable Task Force."  The primary goals of the task force were to reduce the backlogs of aged accounts receivable and explore methods for improving revenue and reimbursement collections at the Totowa PFSC.  There is no evidence that any similar task forces were created for other PFSCs.

In March 2005, Coram's management was provided with an update on the status of the operations and the important issues for the Totowa PFSC.  That update included the amount of accounts receivable debt for commercial payors: the debt over ninety days old was $23,178,406 and the debt over 150 days old was $18,464,270.  Additionally, the update noted that there were still "HR issues, which consume a large amount of management time" and the company continued to "have employees steal from one another and vandalize the department."

 In April 2005, Mr. Wallace decided to bring Bryan Briley, Midwest Regional Vice-President, PFS, to Totowa to cover for Ms. Velella, who was out on maternity leave.  Mr. Briley had originally been hired to be the director of Coram's PFSC in St. Louis in March 2004; he began working at the Totowa PFSC during the second week of May 2005.  While covering for Ms. Velella, Mr. Briley was assigned, as an operational expert, to help to evaluate tactical

4

operations at the Totowa PFSC.  His assignment also included providing feedback on the performance of Ms. Van Haste and the supervisors who reported to her.

On May 31, 2005, Mr. Briley prepared a written "Director's Assessment" of Ms. Van Haste's performance for Mr. Wallace.  In that report, Mr. Briley noted that "[c]urrently, there are no tools in place to meet [Coram's] Best Demonstrated Practices.  The PFSC is in project mode and projects seem to be the only focus.  The review of Summary Reports has not occurred...and [o]verall awareness of how the business is trending is not present or monitored throughout the month."  In concluding his report, Mr. Briley recommended that Ms. Van Haste be replaced if improvements were not made within sixty days.  The parties dispute whether Mr. Wallace received Briley's report, but it is undisputed that in June 2005 Mr. Wallace created a document entitled "Totowa PFS Center Key Management Objectives, June 2005," where he listed specific short and long term goals, and that he gave the document to Ms. Van Haste and Mr. Briley in order to "provide more direction with regards to what changes needed to be put in place."  The document was to serve as a "road map for change that really needed to get in place and under way" and provided detailed and specific goals for both the short term and long term.  Mr. Wallace also directly observed Ms. Van Haste's on-the-job performance many times when he visited the Totowa PFSC.

Mr. Briley had several meetings with Ms. Van Haste and her managers in an effort to improve the Totowa PFSC's performance.  On June 17, 2005, Mr. Briley completed another Director's Assessment regarding Ms. Van Haste.  In that report, he stated that (1) Ms. Van Haste's ability "to initiate change and become proactive in problem solving remains questionable;" (2) she was not "familiar with Coram processes related to reporting tools;" and (3)

to date she had not put forward any "ideas on how to improve negative trends."  He acknowledged some improvement in the performance of the Totowa PFSC, but he recommended that Ms. Van Haste be demoted or replaced within thirty days if further improvements were not made.

**B.      Termination of Van Haste and Other Coram Employees**

In August 2005, following Coram's emergence from bankruptcy, Coram effected a reduction-in-force, in which approximately seventy employees, including senior level Vice Presidents, were terminated.  Mr. Wallace was terminated, as was Carole Schriefer, the in-house attorney for Coram who dealt with payor and compliance issues.  Mr. Wallace, who was terminated before Ms. Van Haste, never recommended her termination but testified that he was "moving in that direction" because he had concluded that Ms. Van Haste "was not going to succeed" because she was unable to manage a PFSC the size of Totowa.  He testified that she "could not seem to grasp the concept required to run an organization of that structure."

On August 15, 2005, Coram hired Danny Claycomb as Senior Vice President of Reimbursement.  Mr. Claycomb reviewed financial information and reports regarding all aspects of Coram's business and accounts receivable management.  Mr. Claycomb's review of Totowa's financial records revealed that the Totowa PFSC was one of Coram's poorest performing centers in both 2004 and 2005.  Mr. Claycomb attests that his review revealed problems involving the amount of open invoices, a high rate of aged accounts receivable, a very high bad debt rate, a high turnover rate among the staff and a dependency on temporary labor.

Mr. Claycomb learned that Ms. Van Haste had been the Director of the Totowa PFSC for the years 2004 and 2005.  Based upon his review of the performance of the Totowa PFSC under

6

Ms. Van Haste's direction, Mr. Claycomb decided to change the leadership of the center.  He recommended to Vito Ponzio, Coram's Senior Vice President of Administration, that Coram terminate Ms. Van Haste's employment.  It is undisputed that at the time of his recommendation, Mr. Claycomb had no knowledge of Ms. Van Haste's threats to contact New York Medicaid regarding billing errors at the Totowa PFSC.  Mr. Briley was not consulted about the decision to terminate Ms. Van Haste.  On September 14, 2005, Mr. Ponzio terminated Ms. Van Haste's employment.

       In addition to the termination of Ms. Van Haste, Mr. Claycomb recommended or made other changes to the management during his first months on the job.  First, he assumed direct control over the center, hiring a Senior Director for the Totowa PFSC who reported directly to him.  Additionally, Mr. Claycomb eliminated the East Regional Vice President position held by Ms. Velella, Ms. Van Haste's supervisor.  Ms. Velella's employment was terminated on November 2, 2005.  Mr. Claycomb also eliminated another Regional Vice President position, and terminated another Director.  Within Mr. Claycomb's first six months at the company, three other PFSC Directors resigned.

**C.    Performance Reviews and Progressive Discipline**

       In April 2004, only a few months after moving to the Totowa PFSC and almost a year and a half before she was terminated, Ms. Van Haste received her only performance appraisal while at the Totowa PFSC.  She received a positive review accompanied by a 12% merit raise. She did not receive any other performance reviews before her employment was terminated.  Ms. Velella testified that she thought Ms. Van Haste was "a strong leader, very professional, and well respected," and several of Ms. Van Haste's subordinates wrote letters of support after she was

7

fired, but there are no positive reviews of Ms. Van Haste from her time at the Totowa PFSC

other than from April 2004.

Coram has a "progressive discipline" policy which specifically preserves the employment

"at-will" relationship.  The policy states that "progressive discipline is not required" and that

management retains the right to "discipline and discharge without progressive discipline and with

or without cause."  Ms. Van Haste, Mr. Wallace and Ms. Schriefer were all terminated without

progressive discipline.

**D.      Medicaid Billing Errors**

Ms. Van Haste claims she was fired from Coram because she threatened to disclose

billing errors related to New York Medicaid.  Coram first became aware of these billing errors in

December 2003 and January 2004, in the course of its year-end audit.  During that audit, Coram's

outside auditor, Ernst & Young, discovered a billing practice for New York Medicaid that they

believed was not in accordance with Generally Accepted Accounting Principals.  After this

discovery, Coram temporarily stopped billing New York Medicaid and the biller in question was

reassigned to another position.  Additional training was provided to the other employees

responsible for billing New York Medicaid.

Coram began an internal review and audit to gain a better understanding of any problems

with New York Medicaid billing and collection.  The preliminary review revealed additional

problems involving billing.  As a result of these discoveries, Coram began a national review of

its Medicaid billing policy and transactions in order to assess the scope of the problems with

Medicaid billing at its PFSCs.  Carole Schriefer, in-house attorney for Coram at the time, and

Deborah Hughes, Coram's Director for Reimbursement and Policy Compliance, worked on the

review and investigation.  Outside counsel Nancy Weinman also assisted.

During the fourth quarter of 2004 and the first quarter of 2005, Coram was also investigating and analyzing billing issues in response to external audits initiated by Medicaid agencies in seven other states.  At the same time, Coram was responding to a subpoena issued by the office of the Attorney General for the state of New Mexico regarding the New Mexico Medicaid Program. The external payor audits and government subpoenas involved time sensitive deadlines that had to be met.  Ms. Hughes, Coram's employee who was responsible for the responses, prioritized her work to respond to the time sensitive work on the external audits and subpoena.  Ms. Hughes resumed her work on the New York Medicaid billing audit in May 2005; the parties dispute whether Ms. Schriefer's work on the audit resumed in May 2005 or whether she had worked on it continuously.

In May 2005, Ms. Schriefer retained outside counsel Matthew Amodeo to participate in the New York Medicaid investigation because of his expertise in New York Medicaid billing issues.  On July 13, 2005, Mr. Amodeo, along with Allen Farber, another partner from Amodeo's firm, Ms. Schriefer, and Ms. Hughes interviewed employees who were involved in New York Medicaid biling at the Totowa PFSC, including Ms. Van Haste.  The interviews were conducted for the purpose of Mr. Amodeo's factual investigation.  After concluding his preliminary factual investigation, Mr. Amodeo called New York Medicaid's fiscal intermediary on July 15, 2005, approximately a year and a half after the auditors discovered the billing errors, and initiated the voluntary disclosure.

By the end of 2005, Coram refunded $766,929.59 to New York Medicaid.  New York Medicaid accepted Coram's voluntary disclosure and refunds and no further action was taken.

9

New York Medicaid could have assessed statutory penalties and fines against Coram had it determined that the timing of Coram's voluntary disclosure was improper.  No such penalties or fines were assessed.

**E.    Ms. Van Haste's Alleged Whistle Blowing Activities**

Ms. Van Haste was one of the employees who performed the preliminary review and analysis on the New York Medicaid files.  She participated in many conference calls and meetings to identify Coram's liability to New York Medicaid.  She understood that this work was being done for the purpose of ultimately making the voluntary disclosure and refund to New York Medicaid.

Ms. Van Haste believed that Coram had sixty days to self-report the billing errors after their discovery in order to comply with Medicaid regulations.  Ms. Van Haste claims to have "expressed her concerns" that Coram had not disclosed the billing errors to New York Medicaid to both Mr. Briley and Ms. Velella, at least weekly, beginning sometime in the spring or summer of 2004.  In June of 2005, Ms. Van Haste alleges that Mr. Briley informed her that Coram had decided not to self-disclose the Medicaid billing errors.  In response, Ms. Van Haste claims to have made her first threat to disclose the errors herself:  she told Mr. Briley that if Coram did not self-disclose she would report the errors to Medicaid.[1]  Again, on July 13, 2005, Ms. Van Haste claims she threatened to disclose the billing errors to Medicaid during the interview conducted by

---

[1] Coram denies that Briley made such a statement or that Van Haste responded with a threat to disclose, but for the purpose of its motion for summary judgment, Coram concedes that Van Haste did in fact make such comments while employed that could be construed as threatening to disclose the errors to New York Medicaid.  (Plt.'s Rule 56.1 Stmt. n. 7.)

Ms. Schriefer, Mr. Amodeo and Ms. Hughes as part of the New York Medicaid investigation.[2]

During the remainder of her employment at Coram or any time after her termination, Ms. Van

Haste never called Coram's anonymous and confidential Compliance Hotline to make a

complaint and never disclosed the billing errors to New York Medicaid herself.

Ms. Van Haste alleges that she was terminated because she continued to pursue the

Defendant regarding its obligation to self-disclose New York Medicaid billing errors.  Although

Coram claims that Ms. Van Haste was terminated due to her poor performance as Director of the

Totowa PFSC, Ms. Van Haste argues that this reason is pretextual.  Coram moves for summary

judgment on the ground that Ms. Van Haste cannot show a causal link between her threats to

disclose the Medicaid billing error and her subsequent firing.  Coram also moves for summary

judgment on the ground that Ms. Van Haste has not demonstrated that Coram's reasons for

terminating her employment were pretextual.

## II.  DISCUSSION

### A.      Standard of Review for Summary Judgment Under Rule 56(c)

Summary judgment is proper where "there is no genuine issue as to any material fact and

. . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  For an

issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury

could find for the non-moving party."  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir.

2006).  For a fact to be material, it must have the ability to "affect the outcome of the suit under

---

[2]Coram also denies that Van Haste made threatening statements during this interview but
for the purpose of its motion for summary judgment, Coram concedes that Van Haste did in fact
make such comments while employed that could be construed as threatening to disclose the
errors to New York Medicaid.  (Id.)

governing law." Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

In a motion for summary judgment, the moving party has the burden of showing that no genuine issue of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case. Id. at 325.  If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine issue of fact exists and a trial is necessary. Id. at 324.  In meeting its burden, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just create "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party.  See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).  The Court's function, however, is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  If there are no issues that require a trial, then judgment as a matter of law is appropriate.

**B.    Requirements to Prove a Claim Under CEPA**

The New Jersey Legislature enacted CEPA to "protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct."  Dzwonar v. McDevitt, 177 N.J. 451, 461 (N.J. 2003).  Under CEPA, an employer shall not take any retaliatory action against an employee who "discloses, or

12

threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer . . . that the employee reasonably believes . . . is in violation of a law, or a rule or regulation promulgated pursuant to law." N.J. Stat. Ann 34:19-3(a)(1).

The analysis of a retaliatory discharge claim under CEPA is similar to the analysis of a retaliation claim under federal discrimination law. Blackburn v. United Parcel Serv., Inc., 179 F.3d 81, 92 (3d Cir. 1999). First, the plaintiff must establish a prima facie case of retaliatory discharge. To meet this burden under CEPA, a plaintiff must demonstrate four elements:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law or a rule or regulation promulgated pursuant to law;
> (2) that he or she performed whistle-blowing activity described in N.J.S.A. 34:19-3a, c(1) or c(2);
> (3) an adverse employment action was taken against him or her; and
> (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

Kolb v. Burns, 320 N.J. Super. 467, 476 (App. Div. 1999).

In addition to the prima facie case, the burden-shifting analysis used in federal discrimination cases involving claims of "pretext" is also appropriate in a CEPA case. Thus, once a plaintiff establishes a prima facie case, the burden of production shifts to the defendant, who must "articulate some legitimate, nondiscriminatory reason for its actions." Blackburn, 179 F.3d at 92. If the defendant provides a legitimate reason for the adverse employment action, the burden of production shifts back to the plaintiff, "who must show that the employer's proffered explanation is merely a ruse or pretext for unlawful retaliation." Schlichtig v. Inacom Corp., 271 F. Supp. 2d 597, 612 (D.N.J. 2003). Because the issue is whether or not the employer took adverse action against the plaintiff for a discriminatory purpose, a showing that the employer's

decision was wrong or mistaken is not sufficient.  Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir.

1994).  Rather, the plaintiff must demonstrate to the court "such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions" in the employer's proffered reasons to support

an inference that her employer's reasons were pretextual.  Id.  If a plaintiff has proved a prima

facie case of discrimination, in order to defeat a motion for summary judgment, the plaintiff

"need only point to evidence establishing a reasonable inference that the employer's proffered

explanation is unworthy of credence."  Blackburn, 179 F.3d at 93.  "Typically, the types of

evidence that the plaintiff must point to are inconsistences or anomalies that could support an

inference that the employer did not act for its stated reasons."  Id. (internal quotations omitted).

    For the purpose of this motion for summary judgment, Coram concedes the first three

elements of Ms. Van Haste's CEPA claim.  (Def.'s Opening Br. at 17.)  First, Ms. Van Haste

believed Coram was violating Medicaid regulations by failing to self-disclose the billing errors.

Second, because of this belief, Ms. Van Haste repeatedly expressed her concern to her

supervisors and threatened to call Medicaid and disclose the billing errors herself on at least two

occasions–during a meeting with Mr. Briley and during an investigatory interview with Ms.

Schriefer and others.  And third, an adverse employment action was taken against her in that she

was fired from her position as Director of Coram's Totowa PFSC.  Coram does not concede,

however, the fourth element–that there was a causal connection between the whistle blowing

activity and the adverse employment action.  Thus, whether Ms. Van Haste has established a

prima facie claim turns on whether or not there is a causal connection between Ms. Van Haste's

threat to disclose the Medicaid billing error and her subsequent firing.

14

### i.    *Prima Facie Case of Causation*

Coram argues that Ms. Van Haste has not met the prima facie requirements of causation. In order to prevail on her CEPA claim, Ms. Van Haste must produce evidence which would permit a reasonable jury to find that it is "more likely than not" that her threats to disclose the billing error to Medicaid was a determinative factor in Coram's decision to terminate her employment. Donofry v. Autotote Sys., Inc., 350 N.J. Super. 276, 293 (App. Div. 2001). Such a causal link may be established through a showing of a highly suggestive "temporal proximity" between the employee's protected activity and the adverse employment action, a "pattern of antagonism" following the protected activity, or other circumstantial evidence. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000).

While temporal proximity, by itself, will rarely provide sufficient evidence of retaliation, a short interval between the two events may be so "unusually suggestive" of retaliation that an inference of causation is allowed. Schlichtig, 271 F.Supp 2d at 612; see also Jalil v. Avedel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (finding an inference of causation where less than two days elapsed between plaintiff's termination and an employer's adverse action). However, the element of causation is highly context specific. Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997). In some situations, there may be valid reasons why the adverse employment action was not taken immediately. Id. Thus, the "absence of immediacy between the cause and effect does not disprove causation." Id.

Ms. Van Haste's employment was terminated on September 14, 2005, less than three months after she threatened to disclose the Medicaid billing errors to Mr. Briley. Although three months is not necessarily suggestive of retaliation, Ms. Van Haste held a high level position as

15

Director of the Totowa PFSC.  The amount of work that needed to be done and the time needed

to find a replacement for Ms. Van Haste could have been a factor in Coram's decision not to

terminate her employment immediately.  See Kachmar, 109 F.3d at 178 (finding a four month

gap between a senior in-house counsel's protected activity and termination did not preclude an

inference of causation because she was not "one of many interchangeable employees").  Thus, a

reasonable trier of fact could draw some inference of causation on the basis of the timing of Ms.

Van Haste's termination.

  While Ms. Van Haste cannot point to a pattern of antagonism following her initial threat

to disclose the billing errors, she does offer additional circumstantial evidence.  Notably, Coram

chose to disclose its billing errors to Medicaid just two days after Ms. Van Haste met with Ms.

Schriefer, Mr. Amodeo and Ms. Hughes and threatened to disclose them herself.  This fact could

give rise to an inference that Coram only disclosed its errors as a result of Ms. Van Haste's

complaints.  Ms. Van Haste's employment was then terminated approximately two months after

Coram disclosed the errors to New York Medicaid.  This time line of events, in conjunction with

evidence indicating some improvement in performance at the Totowa PFSC prior to the

Plaintiff's termination, could provide sufficient circumstantial evidence to raise an inference that

Ms. Van Haste was terminated as a result of her threat to disclose the Medicaid billing errors.

Therefore, Ms. Van Haste has established a prima facie case of retaliatory discharge.

  *ii.*        ***Legitimate, Non-Discriminatory Reason for Termination***

  Because Ms. Van Haste has established a prima facie case of causation and, thus, of

retaliatory discharge, the burden of production shifts to Coram to show a "legitimate, non-

discriminatory reason for its actions."  Blackburn, 179 F.3d at 92.  Coram argues that the sole

16

reason for Ms. Van Haste's discharge was her poor performance.  Coram points to the poor

performance of the Totowa PFSC and asserts that Ms. Van Haste, who was the Director of the

Totowa PFSC, was directly responsible for its performance.  Prior to the termination of Ms. Van

Haste's employment, the Totowa PFSC was Coram's largest and worst performing PFSC in the

country.  Because of these problems at the Totowa PFSC, in February of 2005, Coram created an

accounts receivable task force in order to improve revenue and reimbursement at the Totowa

PFSC.  One of the goals of the task force was to reduce the backlog of aged accounts receivable.

The task force determined that there was $23,178,046 worth of accounts receivable that was over

90 days old.  Coram also notes that the Totowa PFSC underwent significant restructuring and re-

staffing while Ms. Van Haste was the director and asserts that she was unable to effectively lead

her department, train her staff, or motivate her employees.  Coram maintains that it is for these

reasons, and not Ms. Van Haste's alleged whistle-blowing activities, that she was fired.

Additionally, Coram points out that Ms. Van Haste was not the only person fired from

Coram at that time.  Rather, Coram claims that it was restructuring the entire company after its

bankruptcy.  In fact, due to the restructuring and re-staffing undertaken by Coram, several high-

level employees were terminated around the same time as Van Haste, including (1) Carole

Schriefer, Coram's in-house counsel who dealt with payor and compliance issues; (2) Angela

Velella, Van Haste's direct superior; and (3) Merl Wallace, Velella's superior.  Concurrently,

Coram terminated seventy other employees, eliminated several positions, and replaced personnel

throughout the company.  Thus, Coram offers sufficient evidence of a legitimate, non-

discriminatory reason for the firing of Ms. Van Haste.  Therefore, the burden shifts back to Ms.

Van Haste to prove that Coram's proffered reasons for her termination were pretextual.

### *iii.*      *Pretext*

Ms. Van Haste alleges that Coram's proffered reasons for her termination were pretextual.  First, she argues that she never received any notice of any performance issues prior to her termination.  The only evaluation Van Haste received prior to her termination demonstrated that she had performed above her employer's expectations and was accompanied by a merit raise. That evaluation, however, took place in April of 2004 before she took on additional responsibilities as the sole Director of the Totowa PFSC.  The only other documented evidence regarding the quality of Ms. Van Haste's work are Mr. Briley's May 31, 2005 and June 17, 2005 reviews of Ms. Van Haste, which described problems with her performance, though these reviews may not have been shared with Ms. Van Haste.  Further, it is undisputed that she was an at-will employee who could be terminated without notice at any time and that Coram did not have a policy which required progressive discipline for directors.  In fact, other "management level" employees were likewise fired without progressive discipline.

Second, Ms. Van Haste argues that none of her superiors–including Mr. Wallace and Ms. Velella–recommended she be terminated.  The fact remains, however, that Mr. Briley's recommendations that Ms. Van Haste be terminated were documented.  It is undisputed that Ms. Van Haste did not make threats to disclose the Medicaid billing errors in Briley's presence until June 2005, after he first recommended her termination in May, 2005.  It is also undisputed that Mr. Claycomb, who made the final decision recommendation to Mr. Ponzio to terminate Ms. Van Haste's employment, was not aware of the threat Ms. Van Haste made to report the Medicaid billing errors.

Finally, Ms. Van Haste argues that although the Totowa PFSC was performing poorly,

she had inherited those issues and was turning the center around.  In fact, she suggests that the

Totowa PFSC had improved collection activity under her direction and was performing at

acceptable levels by the end of the summer of 2005.  Additionally, she points to positive letters

of support from three employees praising her efforts as director of the PFSC.  These letters, dated

several days after Ms. Van Haste was fired, are in contrast to (1) Mr. Briley's May 31, 2005

Director's Assessment, which questioned the performance monitoring tools used at the center

and suggested the termination of Ms. Van Haste's employment; (2) Mr. Wallace's lack of

confidence in Ms. Van Haste's ability to run the center; and (3) Mr. Claycomb's determination

that a change in leadership at the center was necessary.  Contrary to the assertions of the Plaintiff,

however, this conflict does not create a material question of fact.  Even if Coram's decision to

terminate Ms. Van Haste were "wrong or mistaken," the decision would not be sufficient

evidence to raise an inference of pretext.  See Fuentes, 32 F.3d at 765.  Ms. Van Haste's

argument for pretext fails to account for the fact that two members of Corum's upper level

management specifically recommended that she be terminated and that those recommendations

were made without any knowledge of her threats to disclose the billing errors.  The fact that some

employees were satisfied with her performance is not persuasive.

　　　　None of Ms. Van Haste's arguments demonstrate "such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions" in Coram's proffered reasons to support an

inference that her employer's reasons were pretextual.  See Fuentes, 32 F.3d at 764.  Rather, the

undisputed evidence–the poor long-term performance of the Totowa PFSC relative to other

centers, the elimination of employees in similar positions, and the documentation of problems

with Ms. Van Haste's performance–is consistent with Coram's reasons for terminating her

19

employment.  There is no evidence that Coram's stated reason for firing Ms. Van Haste was a post hoc rationalization, particularly given that the initial recommendations that she be terminated either preceded her threats to disclose the billing errors or were made without any knowledge of those threats.  Because there is no evidence that Coram's reason for terminating Van Haste's employment–namely, the poor performance record of the Totowa PFSC under her leadership–was pretextual, summary judgment will be granted in favor of Coram.

## IV.  CONCLUSION

For the reasons set forth above, Coram's motion for summary judgment will be granted as to Van Haste's claim under the New Jersey Conscientious Employee Protection Act.  The Court will enter an order implementing this opinion.

s/ Dickinson R. Debevoise
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: October 1, 2008

20